Edmund R. Boots v. Commissioner.
Boots v. Commissioner
Docket No. 7493.
United States Tax Court
1947 Tax Ct. Memo LEXIS 167; 6 T.C.M. (CCH) 756; T.C.M. (RIA) 47174; June 25, 1947
*167 Petitioner in the taxable years was a party to an agreement with two corporations for the exploitation and development of patent rights in a limited field through a system of licensing. Under the agreement certain patent rights belonging to the parties were pooled and assigned to one of the corporations as trustee for the purpose of facilitating the execution of licenses to others and collecting royalties. The duties of the trustee were merely ministerial. Each of the parties to the agreement performed active services in the common enterprise. One of the corporations, under a license from the trustee, manufactured and created markets for the devices; the other corporation provided the services of a skilled inventor in its employ in research and technical advice; and petitioner was active in inducing other manufacturers to take licenses under the patent rights. The organization itself did no manufacturing or selling of the patent devices. Practically its entire income was from royalties under the patent licenses. The net income from such royalties was to be divided equally among the parties, one-third to petitioner, and one-third each to the two corporations. Held, the organization *168 was a joint venture or pool classifiable as a partnership under the Internal Revenue Code and not an association taxable as a corporation. Petitioner is taxable on his one-third distributive share of the income of the enterprise. Thomas F. Boyle, Esq., and Charles S. Whitman, Jr., Esq., 25 Broad St., New York, N. Y., for the petitioner. Albert H. Monacelli, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax for 1940 and 1941, in the respective amounts of $2,244.01 and $25,864.11. The issue is whether an organization with which petitioner was connected and from which he received income in the taxable years was an association, taxable as a corporation, or a joint venture or partnership under the Internal Revenue Code. Findings of Fact Petitioner is an individual residing at Short Hills, New Jersey. His tax returns for the periods here involved were filed with the collector of internal revenue at Newark, New Jersey. American Gas Accumulator Company, hereinafter called A.G.A., is a corporation organized under the laws of New Jersey with offices at Elizabeth. Petitioner *169 is an engineer by profession and became associated with A.G.A. in 1920. In 1929 he was vice-president and general manager of the company. During the years of his association with A.G.A. and since then, he has been concerned with problems of highway safety, such as traffic beacons and reflectors installed on automobiles. In 1929 A.G.A. was the patentee and licensee of certain patents from one Jonathan Stimson in the field of parallel beam reflectors. These patents were applicable to highway marking, railway traffic, and automobile traffic. Stimson was an inventor whose patent applications had been involved in an interference proceeding in the Patent Office with certain applications of A.G.A. The licenses from Stimson to A.G.A. grew out of the interference proceeding. Petitioner was primarily concerned with the application of the parallel beam reflector device to automobiles and other vehicular traffic, and he spent considerable time trying to promote commercial development in that field. A.G.A. originally was primarily interested in the use of the device in highway safety signals, and it did not share petitioner's enthusiasm about the automotive application. It considered selling *170 petitioner the rights pertaining to the latter field for a lump sum. Petitioner finally succeeded in interesting General Motors Corporation in the patents and patent rights with respect to their application in the automotive field. General Motors' participation was desirable because of its manufacturing and marketing organizations. Petitioner wanted A.G.A. to join with him and General Motors in the development, because A.G.A. could furnish the technical services and skill of Stimson as an inventor. General Motors' interest in the project revived the interest of A.G.A., and the result of petitioner's negotiations was a determination on the part of petitioner, General Motors, and A.G.A. to carve out of the patent field those rights relating to automotive use of the reflecting device and jointly exploit the licensing of such rights. On October 21, 1929, an agreement was executed by A.G.A., GuideLamp Company (subsidiary of General Motors), and petitioner. Under the agreement it was provided that petitioner and A.G.A. should transfer to A.G.A., as trustee, their rights in the Stimson license agreements and in certain patents and patent applications which they then owned, in so far *171 as they related to the use of parallel beam reflectors in the field of automotive and vehicular traffic. Guide agreed to assign to A.G.A., as trustee, all such rights as it then owned or might later acquire; and A.G.A., as trustee, was to grant Guide a license of such patent rights to make, use, and sell parallel beam reflectors, the license to be nonexclusive in the case of "standard equipment," that is, devices purchased by other manufacturers from Guide to be installed by them on products of their own manufacture, and exclusive in other cases, such as, for example, the automobile accessory field. Guide agreed to pay A.G.A., as trustee, royalties based on the manufacture and sale of the device at rates fixed in the agreement. Article 3 of the agreement reads as follows: "Immediately upon the execution of this agreement, a Committee of three persons shall be formed, consisting of the said E. R. Boots or other representatives of A.G.A. - Boots interest, the president of the Guide Lamp Corporation and a third member to be chosen by them, (Mr. C. E. Wilson, a vice-president of General Motors Corporation, so long as he will serve). "This Committee shall have full power to determine *172 all matters relating to the proper maintaining of the patents or patent applications mentioned in this agreement including the litigation thereof; it shall also have full power to determine whether or not licenses shall be granted by the Trustee for the manufacture or sale of reflectors for Standard Equipment, and shall fix the terms and conditions of all such licenses, and no license other than the one herein mentioned to Guide shall be granted by it without the approval of the Committee." All royalties from Guide and other licensees were to be paid to A.G.A., as trustee, and disbursed by it upon the written direction of the committee. After setting aside a fund of $25,000 from royalty collections for the purpose of litigation and other patent expenses, the trustee was from time to time to distribute the surplus funds to the parties to the agreement upon the direction of the committee, one-third to A.G.A., one-third to petitioner, and one-third to Guide. The trustee was entitled to no compensation for its services and was to be responsible only for acts of bad faith on the part of its officers and employees. Article 8 of the agreement provides that: "Boots agrees to devote as *173 much of his time as may be reasonably necessary at all times during the continuance of this agreement to soliciting business from concerns that might purchase lamps containing said reflectors, other than the units of General Motors Corporation whose business will be solicited by Guide, but he shall at all times follow the advice of the Committee in respect to the manner in which such soliciting shall be done by him, the prices he may quote, terms of sale, etc. Boots shall make no charge for any of the said services but he shall be entitled to receive from the Trustee with the approval of the Committee his reasonable and proper expenses." It was further provided that petitioner could not dispose of his interest in the agreement without the consent of the other parties, and that in the event of his death during the term of the agreement, the other parties should have an option to purchase his interest at a price to be agreed upon or fixed by arbitration. The term of the agreement was to be five years, with an option on the part of Guide to renew it for periods extending through the life of the patents. If Guide should determine not to extend the term, but should consent to continue *174 any license it may have granted the trustee, the petitioner and A.G.A. were required to purchase Guide's interest at a price to be agreed upon or determined by arbitration. Otherwise, if Guide should not consent to the continuation of any such license, then petitioner and A.G.A. were not required to purchase Guide's interest. Article 11 of the contract reads: "It is hereby agreed that the interest given or granted to American Gas Accumulator Company, as Trustee, by Boots, Guide, or A.G.A. whether the same hereinbefore has been referred to as a transfer or as an assignment or as a license shall be limited and restricted to rights to manufacture, use and sell devices embodying the inventions of the patents and applications for patents for use as mobile equipment except equipment for rail cars and the right of the Trustee, under this agreement, as to licenses shall be limited and restricted to the granting of licenses for the manufacture and sale of such devices for the purposes above specified and for no other purpose." A.G.A. agreed that if it should determine not to exercise its options to renew the Stimson license, it should transfer the license to itself as trustee, notify *175 the committee, and permit the committee to exercise the renewal option and instruct A.G.A. to continue the license as trustee. Finally, it was provided in Article 14 that: "This agreement may not be assigned by any party hereto without the consent of the others, but in the case of Guide, should its assets and business be disposed of to some other corporation, the agreement shall inure to the benefit of and be binding upon such corporation." Upon the execution of the agreement Guide paid petitioner $25,000, two-thirds of which petitioner paid to A.G.A. At the time the agreement was executed petitioner was an officer of A.G.A. and continued to be until the end of the year. On November 15, 1929, A.G.A. executed an assignment to itself, as trustee, of the patents, patent rights, and license agreements mentioned in the October 21st agreement "in so far and only in so far as the said inventions apply to devices intended for mobile uses except for rail cars", to be held subject to the conditions set forth in that agreement. The assignment provided, however, that if the agreement should be terminated prior to the expiration of the patents, then upon such termination the interest in *176 the inventions and patents so transferred should be reconveyed to A.G.A. Prior to October 20, 1934, General Motors acquired all the assets and business of its subsidiary Guide. On that date a new agreement was entered into between A.G.A., General Motors, and petitioner, extending and modifying in certain respects the original agreement of October 21, 1929. The term of the agreement was extended for the lives of the patents, subject, however, to General Motors' right to cancel it at the end of any year upon two months' written notice to the other two parties. A new license agreement between A.G.A. and Stimson, whereunder Stimson was to be paid $7,500 a year by A.G.A. and a percentage of its profits, was substituted for the original license agreement; and provision was further made for payment of $5,000 a year to Stimson by A.G.A., as trustee, "for technical and advisory services in furtherance of the exploitation of devices licensed to the Trustee". It was agreed that there should be no change in the membership or personnel of the committee, but that in the event C. E. Wilson severed his connections with General Motors, his place on the committee should be taken by his successor. *177 However, it was provided that: "* * * The Committee recognizes STIMSON or a designated officer of AGA as the authorized representative of the AGA one-third interest in the Trust. It will keep such representative fully informed of its activities and will give consideration to his statement of the AGA position on Trust matters." In the agreement General Motors obligated itself to exploit energetically the Stimsonite and A.C. type of reflector units in the jobber and chain store field, so as to produce substantial sources of revenue. On March 14, 1940, the agreement, as amended, was further modified solely to make changes in the royalty rates. The above agreements are the only documents affecting the relations among the three parties thereto. No certificates of beneficial interest were ever issued to any party. The organization has no seal, charter, constitution, by-laws or similar governing rules, officers, or board of directors. It kept no minutes. A.G.A., as trustee, collected royalties from the licensees; and records of royalties received and disbursements made were kept by employees of A.G.A., one of whom, an assistant treasurer of A.G.A., received $300 a year for his services *178 in that connection and in connection with income tax returns. The committee provided for in the agreement has met only about one-half dozen times since 1929. It was never contemplated that the organization established by the agreements should engage in manufacturing or selling devices embodying the inventions, and it never, in fact, engaged in such activities. Its activities consisted of the conservation of the patents and patent rights and licensing others to manufacture, use, and sell the devices, and practically the entire income of the organization was derived from royalties under such licenses. Each of the three parties to the agreement had special qualifications of a character likely to promote the success of the venture; A.G.A., because it had in its employ Stimson, an outstanding inventor in the field; General Motors, because it was the largest manufacturer of automobiles and had extensive manufacturing and marketing facilities; petitioner, because he had been actively concerned with public educational features of highway accident prevention through the use of the parallel beam reflectors and other devices and had done a considerable amount of promotional work with state *179 administrative and legislative bodies and had had contact with prospective licensees. In the negotiation of licenses the petitioner and General Motors actively participated, and General Motors under its license manufactured and helped to create a market for devices embodying the invention. In 1934, respondent, while investigating the return filed by A.G.A., as trustee, for 1932, determined that the organization was an association taxable as a corporation. A.G.A. consulted its accountants and decided to acquiesce in the respondent's ruling. It thereafter filed corporate tax returns for the organization. The deficiency determined by respondent against petitioner for the year 1940 is based on the theory that the organization established by the above agreements was an association taxable as a corporation and the amount of distributions which petitioner actually received were taxable to him as a dividend, although greater in amount than a one-third distributive share of net income of the organization. On the other hand, in the deficiency which respondent determined against petitioner for 1941, respondent holds that petitioner is taxable on a one-third distributive share of the net income *180 of the organization, which is an amount greater than the actual distributions to petitioner. In the taxable years 1940 and 1941, the organization in question was not an association taxable as a corporation, but was a joint venture or pool classified as a partnership under the Internal Revenue Code; and the petitioner in each year is taxable on his distributive share of the net income of the organization. Such facts as have been stipulated by the parties and not set out herein are adopted by this reference. Opinion ARUNDELL, Judge: The deficiencies determined by the respondent for the two taxable years 1940 and 1941, were based upon two completely inconsistent theories - in the first instance, that the organization in question was an association and, in the second instance, that it was a partnership or joint venture. It is not claimed by respondent that there was any change in the status of the organization between the two years. On brief, respondent has apparently elected to stand by the position that the organization in both years was an association taxable as a corporation. Nevertheless, in these circumstances it can hardly be said that any particular sanctity attaches to *181 the respondent's determination. Under the Internal Revenue Code, associations, joint-stock companies, and insurance companies are classified with corporations and taxed accordingly. On the other hand, the classification of partnerships includes syndicates, groups, pools, joint ventures, and certain other unincorporated business organizations. Section 3797, Internal Revenue Code. Whether or not a particular business organization falls into the one category or the other depends upon which it more closely resembles. For it is resemblance and not identity which is required. Morrissey v. Commissioner, 296 U.S. 344. The "real test is whether the enterprise more nearly resembles in general form and mode of procedure a corporation than a partnership." Bert v. Helvering, 92 Fed. (2d) 491. From a careful consideration of all the aspects of the organization here in question, we conclude that it is a pool or joint venture and more nearly resembles a partnership than a corporation. There was a pooling of limited rights under the various patents relating to parallel beam reflecting devices as applied to automotive and vehicular *182 traffic for the purpose of licensing those rights to others and collecting royalties therefrom. There was a combining of the property, efforts and skill of the three parties to the agreement, profit was jointly sought, and the venture was limited in scope and duration as distinguished from the conduct of general business. See Commissioner v. Gerstle, 95 Fed. (2d) 587; Tompkins v. Commissioner, 97 Fed. (2d) 396; Cooperstein v. Shapiro, 122 N.J. Eq. 238, 192 Atl. 826. We do not have here the case of a trustee with full powers and authority actively conducting a business enterprise and periodically distributing profits to beneficiaries who do not otherwise participate in the conduct of the business. In this instance, the duties of the trustee were ministerial - the execution of the formal license agreements after negotations with prospective licensees were completed by petitioner or by General Motors; the collecting of royalties; and the keeping of records, of receipts and disbursements, etc. The trustee was little more than a figurehead. The trust itself was merely a device used as a convenient method of assembling into one place the related *183 rights of the various patents and of permitting the execution of licenses to others who used these combined rights. Cf. Hugh MacRae Land Trust, 1 T.C. 899. That the mere use of a trust device for such purposes of convenience does not require taxation as an association, see Lewis & Company v. Commissioner, 301 U.S. 385. On the contrary, this is a case where three parties, having agreed to pool certain rights and to perform services, have come together in a common enterprise in which each is actively engaged in a personal or individual capacity. Two of the parties to the venture were corporations and the third, the petitioner, was an individual, but each party had special qualifications, experience, or facilities of a kind likely to promote the success of the enterprise and each performed a particular distinct function. Petitioner on his part agreed to devote as much of his time as might be reasonably necessary to solicit business from concerns other than the units of General Motors Corporation and he was active in negotiating licenses with other manufacturers. A.G.A. on its part provided the skill and technical advisory services of the inventor Stimson. *184 General Motors agreed to do its best to exploit the sale of the reflector units and under its license it manufactured and created markets for the devices both as standard equipment and as automotive accessories. The organization itself was never intended to and did not engage in any manufacturing activities. Practically the entire income consisted of royalties under the licenses executed. The profits resulting from these efforts were to be shared equally by the three parties to the agreement. In these respects, we find a close analogy to partnerships with each partner rendering services in the promotion of the common enterprise and all sharing the profits, and we think there is marked dissimilarity to corporate forms and modes of operation. Moreover, it should be remembered that General Motors had the right to terminate the agreement at the end of any year. It would be strange indeed to find a corporation which could be dissolved at the election of a minority stockholder. While it may be that some of the characteristics mentioned in the Morrissey case, supra, such as the trustee who holds title to the property embarked on the undertaking, were present here, we think most of them *185 were lacking. There was no free transferability of beneficial interest. The interests of the parties in the agreement involved not alone the right to share in profits but also the duty to perform services of a skilled nature. Nor do we think that the continuity of the enterprise would have been unaffected by the death of petitioner. It is hardly likely that his executor or administrator would have been qualified to perform the services petitioner was obligated to render. The parties to the agreement did not by any express provision seek to obtain limited liability to outsiders and, in view of the manner in which the enterprise was operated with the trustee subject to the control of the parties, it is not likely that through the trust device they could have avoided unlimited personal liability to third parties. See Bank of America v. Scully, 92 Fed. (2d) 97. Likewise, we think there is little analogy between the committee, which respondent stresses as affording centralized management, and a corporate board of directors acting for stockholders in the corporation. In our opinion, the committee amounted to nothing more than the parties to the agreement acting together to *186 decide on such questions as the proper form of licenses, to whom licenses should be issued, questions relating to the proper maintenance of patents and litigation thereof, when profits should be distributed, etc. - such matters as partners would ordinarily decide together. In practice, the committee held very few meetings during the organization's existence and the ordinary business of the organization was conducted by the parties to the agreement with each acting more or less independently according to the particular functions each was best suited to perform. For the reasons stated, we hold that in the taxable years the organization in question was a joint venture or pool classifiable as a partnership under the Internal Revenue Code and was not an association taxable as a corporation. It follows that in each of the years petitioner is taxable on his one-third distributive share of the net income. Petitioner has apparently abandoned a minor issue originally raised in the petition with respect to the amount of depreciation allowable to the organization on a plastic moulding machine purchased by it for Stimson's laboratory use. He makes no mention of this issue in either his original *187 or his reply brief. In any event, we would not feel warranted on this record in disturbing the amount of depreciation allowable by the respondent. Decision will be entered under Rule 50.